UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CODY RICKARD, | ) | CASE NO.: 3:22CV1278 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | U.S. DISTRICT JUDGE |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| WARDEN JAY FORSHEY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I. Introduction

Petitioner, Cody Rickard, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Rickard is an Ohio prisoner who is currently serving a sentence of 29 years to life for numerous convictions stemming from a motor vehicle accident that resulted in the death of one person and injuries to several others. Although Rickard has been assisted by counsel, his petition is not a model of clarity. It *appears*, however, that Rickard asserts one ground for relief. (ECF No. 1). Respondent, Warden Jay Forshey, filed a return of writ on October 4, 2022 (ECF No. 12) and Rickard filed a traverse on November 2, 2022 (ECF No. 13).

This matter was referred to me under Local Rule 72.2 to prepare a report and recommendation on Rickard's petition. Rickard's sole ground for relief is not cognizable in federal habeas proceedings; thus, I recommend that the Court dismiss his petition in its entirety and not grant him a certificate of appealability.

## II. Relevant Factual Background

The facts found by the appellate court of record "shall be presumed to be correct," and the

1

petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), cert. denied, 527 U.S. 1040 (1999).

Ohio's Sixth District Court of Appeal detailed the facts of Rickards's convictions and sentences as follows:

> On the morning of October 28, 2013, a crew of CSX workers were repairing a railroad crossing near the town of Bradner in Wood County, Ohio. The crossing was located within several hundred feet of the intersection of John Street and South Main Street, otherwise known as Bradner Road. Appellant, driving a white Dodge Charger, passed a barricade at the intersection, which stated "Road Closed, Local Traffic allowed." Travelling down Bradner Road, appellant then sped past a second barricade, and struck several traffic directional signs and a telephone pole. After striking the telephone pole, appellant's car swerved into the mechanic's truck where several CSX workers were standing. Three workers were struck in the collision. Two of them, Jimmy Conley and Luis Knott, suffered substantial injuries. Tragically, the third worker, Paul Castle, later died from the impact.
>
> On November 6, 2013, in case No. 2013CR0574, the Wood County Grand Jury indicted appellant on two counts of vehicular assault, in violation of R.C. 2903.08(A)(2)(a) and (C)(2), and two counts of felonious assault, in violation of R.C. 2903.11(A)(2) and (D)(1)(a). Several days later, on November 12, 2013, Paul Castle succumbed to his injuries. Thus, the Wood County Grand Jury, in case No. 2013CR0596, indicted appellant on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(b) and (B)(3), one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a) and (B)(3), and one count of felony murder in violation of R.C. 2903.02(B).
>
> Appellant pleaded not guilty to the charges, and a jury trial was held on January 27-30, 2014. The jury returned a verdict of guilty on all counts, and the trial court went immediately to sentencing. In case No. 2013CR0574, the court found that the two offenses of vehicular assault merged with the two offenses of felonious assault, with the state electing to proceed to sentencing on the counts of felonious assault. The trial court ordered appellant to serve seven years in prison on each count, with those sentences to be served consecutively. In case No. 2013CR0596, the trial court found that the two offenses of aggravated vehicular homicide merged with the offense of murder, and the state elected to proceed to sentencing on the count of murder. The trial court then ordered appellant to serve a term of 15 years to life in prison, and further ordered that the sentence be served consecutively to the sentence imposed in case No. 2013CR0574, for a total prison term of 29 years to life.

2

Appellant timely appealed his convictions, which we affirmed in State v. Rickard, 6th Dist. Wood Nos. WD-14-016, WD-14-017, 2015-Ohio-3298.

However, while his appeal was pending, appellant filed a petition for postconviction relief, in which he argued that trial counsel was ineffective for failing to investigate his mental status at the time of the incident. The trial court held a hearing on appellant's motion, and subsequently denied it on June 19, 2015. Appellant appealed the denial of his postconviction motion, and in *State v. Rickard*, 6th Dist. Wood Nos. WD-15-046, WD-15-047, 2016-Ohio-3374, we reversed. In our decision, we noted the following facts:

> When approached, appellant stated in a "demonic" voice that "the devil is my savior." When he exited the vehicle he appeared to be celebratory, stating "Yeah." Another witness described appellant "hooting and hollering and saying 'this was great.' " A deputy who arrived at the scene after appellant was restrained in the back seat of the patrol car observed appellant "was just rambling just crazy thoughts or crazy statements." The Wood County Hospital emergency room personnel indicated appellant's "mental behavior was of great concern." Appellant insisted the deputy and medical personnel tell him that they loved him. In the emergency room while handcuffed, he was "dry humping the door in a sexual manner, and he was laughing about it. His behavior was completely erratic." *Id*. at ¶ 12.

We then held that the facts of the case warranted at least a modest inquiry and exploration of the defense of not guilty by reason of insanity, and the trial court abused its discretion when it found that appellant was not prejudiced by his trial counsel's failure to investigate the state of his mental health. *Id*. at ¶ 17, 21. Therefore, we remanded the case to the trial court for further proceedings.

On remand, appellant entered a plea of not guilty by reason of insanity, and he was committed to the Northwest Psychiatric Hospital for a mental health examination. Appellant was later committed to the Twin Valley Behavioral Healthcare Hospital in Columbus, Ohio, for an additional mental health examination.

Ultimately, the matter proceeded to a second trial on February 6-10, 2017. At the second trial, multiple CSX workers who were present on the day of the incident testified. Their testimony included various accounts of hearing a loud noise and seeing the flash of a white car as it barreled down the road and careened into the telephone pole and ultimately the victims. They described appellant's behavior after the collision as erratic, recounting that he climbed out of the car celebrating and yelling "Yeah!" One of the witnesses, Christopher Delano, testified that he went to see if appellant was okay as he was climbing out of the car, and appellant

3

looked at him and said in a "demonic voice," "[T]he devil is my savior." On cross-examination, however, Delano admitted that he wrote in the initial police report that appellant "jumped up and said 'whoo-whoo touch down. I love God. God is my savior.'" The witnesses described that appellant sat down briefly, but then got up and tried to fight with one of the CSX workers. Appellant then took off running down the railroad tracks, stopping only to throw rocks at the workers who were chasing him. Eventually, one of the workers caught up to appellant and struck him in the back of the head with a metal rod. Shortly thereafter, the police arrived and placed appellant in handcuffs in the back of a cruiser.

While in the back of the cruiser, appellant continued to act abnormally. Appellant did not appear to understand what was going on, and at various times looked around and wanted everyone to tell him that they loved him. Appellant was treated on the scene for his head injury by medical personnel, and then transported to the emergency room, where his erratic behavior continued. At the hospital, a blood draw was performed to screen for controlled substances, but the test results came back negative.

On the third day of trial, the testimony transitioned to expert witnesses regarding appellant's mental state. Dr. Daniel Rapport testified first. Rapport examined appellant the day after the incident, on October 29, 2013. He testified that appellant was uncooperative and irritated, but that appellant denied any symptoms of mental illness. Further, Rapport testified that he did not observe any signs of mental illness. Rapport agreed with another physician's finding that there was no evidence that appellant thought on October 28, 2013, that it was right to hit people with his car, and there was evidence that appellant understood that a person could be injured or killed in a car crash, but that appellant was not consciously considering the risk of harm to others at that time.

Dr. Delaney Smith testified next. She testified that she met with appellant three times at the end of October 2016. Smith opined that appellant was suffering from substance induced psychotic disorder at the time of the offense. Smith reasoned that the diagnosis was supported by appellant's delusional beliefs that he had been chosen by God and was on a special mission to prove his worth, and his admission that in the days preceding the event he used the drugs Ketamine, Lyrica, and LSD. Smith explained on cross-examination that psychotic illness caused by the drugs, Ketamine in particular, can sometimes last weeks. In addition, Smith ruled out a diagnosis of schizophrenia because appellant's psychotic symptoms had completely resolved themselves without medical treatment, and appellant has not been diagnosed with psychosis over the course of two subsequent psychiatric hospitalizations.

The defense then called its expert witness, Dr. John Louis Tilley, out of order. Tilley examined appellant in the fall of 2014. Tilley testified that he determined

4

that appellant was disorderly psychotic at the time of the event, and diagnosed him as being schizophrenic. In support of his conclusion, Tilley relied on several factors, including appellant's delusional beliefs that he was receiving special messages from God, and that appellant was experiencing auditory hallucinations. In addition, Tilley considered statements from appellant's mother describing that appellant was acting abnormally in the weeks and days leading up to the incident, as well as statements from appellant's ex-girlfriend that appellant would become weird and say odd things and act bizarrely. Finally, Tilley noted appellant's behavior after the event as described by the CSX employees and the emergency responders.

Tilley also testified that he disagreed with Smith's assessment. Tilley explained that the evidence did not support a diagnosis of substance induced psychotic disorder because appellant stated that he had not used drugs for a couple of weeks leading up to the event, and specifically stated that for several days before the event he was actively avoiding drugs because it would interfere with the spiritual connection he had with God. Tilley then addressed Smith's disagreement over the diagnosis of schizophrenia, and ultimately testified that regardless of what label is attached to appellant's diagnosis, the end result is that appellant was decidedly psychotic and met the criteria for "insanity" as it is used in the court system.

The final expert witness on appellant's mental state was Dr. Jonathan Sirkin. Sirkin interviewed appellant three times in July 2016. Sirkin believed during the interviews that appellant was "malingering," i.e. exaggerating or fabricating symptoms, and so he administered the SIRS-2 diagnostic test, which he testified showed that appellant was indeed feigning symptoms of mental illness. Based on his examination, Sirkin concluded that appellant suffered short-term symptoms of psychosis on October 28, 2013, as a result of voluntary substance intoxication. Further, he concluded that appellant was exaggerating or fabricating his account of psychiatric symptoms prior to October 28, 2013, and that appellant's claimed hallucinations, such as manipulating colors or seeing his teeth melt, were typical of hallucinogen abuse, but almost non-existent in genuine psychotic mental illness. Like Smith, Sirkin noted that appellant has not displayed any active symptoms of psychosis since the event, and conditions like schizophrenia do not suddenly appear one day and disappear completely the next, never to return over the next three years. In addition, Sirkin concluded that on October 28, 2013, appellant had the capacity to understand the wrongfulness of hitting other people with his car, even if he did not intend to hit them.

Following the medical experts, the state called Lieutenant Christopher Kinn of the Ohio State Highway Patrol as a crash reconstruction expert. Kinn testified that he examined the data recorder contained in appellant's vehicle. It was his belief that the triggering event that was captured on the data recorder was when appellant's vehicle crashed into the telephone pole, shearing the pole off of its base and knocking it to the ground. The data recorder showed that in the five seconds before

5

the triggering impact, appellant's car started at a speed of 41 m.p.h. and accelerated to a speed of 61 m.p.h. The recorder also showed that the accelerator was pressed all of the way down during this time until three-tenths of a second before impact. In addition, the steering wheel was at approximately zero degrees—pointed straight ahead—until it turned 22 degrees to the right at four-tenths of a second before impact, and 48 degrees to the right at three-tenths of a second before impact. Finally, Kinn was asked about the deployment of the air bag. He testified that in his experience an air bag deflates in about half the time that it takes to inflate. Kinn stated that whenever he was in a crash where the air bag deployed, the air bag did not obstruct his view, and he was able to safely steer the car off of the road.

After the state finished presenting its evidence, appellant moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. Appellant then took the stand in his own defense.

Appellant testified that on or around October 16, 2013, approximately four days before his birthday, he took acid, LSD, and Ketamine together because he thought it would help him be more creative in writing and performing his music. According to appellant, he did not take any other drugs between that time and October 28, 2013. Appellant stated that after taking the drugs he had "super sensitive clarity."

A few days later he was with his nephews and they downloaded a ghost hunter app for his phone that would show a green or red dot wherever there was a spirit. Appellant assumed that the red dot was a negative spirit and the green dot was a positive spirit. Appellant testified that while using the app he felt a spirit's presence and that the spirit was with him.

A couple of days after the event with the ghost hunter app, appellant was in his room looking up the meaning of his name. Appellant found that his name was connected with a god named Oda, who was a god of magnetic and chemical reactions. Appellant testified that he felt like something was coming into his brain and feeding him information. Appellant then waved his right hand in front of a lamp in his room and saw a green mist fly into the air, which he associated with positive energy. He then waved his left hand and saw a red mist, which he associated with negative energy. Appellant recalled that he played with that light for hours.

A few days later, on Saturday, October 26, 2013, appellant went to a Halloween party at a local bar. Appellant testified that he had a super sense of preventing bad things from happening, and he sensed that a fight was going to break out. Appellant stated that he intervened and prevented the fight.

Appellant testified that the next day, he was feeling really good because he had a new sense of clarity and he had stopped the fight the night before. Appellant recounted that he was calling all of his friends, trying to get them to stop doing

drugs and to follow him down this good new path that he was on.

On the morning of October 28, 2013, after another night of little sleep—appellant stated that for the past few days he felt so good he could not sleep—appellant testified that his mother wanted him to help her clean out a room and carry things down to the basement. Appellant stated that he knew what she was going to ask him to do before she asked it. He also stated that his mother seemed like she was possessed by some type of spirit or demonic possession. Appellant testified that by saying certain code words such as hot or cold, he could manipulate the spirit inside of his mother. It then appeared to appellant that the spirit inside of his mother could control him through her vision. Appellant realized that he could not let the spirit get ahold of his vision, so he blocked it with a dresser drawer, and only looked at his mother through a mirror. Appellant testified that at the same time, he could see the television through the mirror, and the television was talking to him and laughing at him.

After that, appellant left the house to go uptown to get the tire on his car fixed because the tire kept going flat. Appellant was unsuccessful in getting the tire fixed, so he went back home. When he got home he was looking for his pack of cigarettes in his car. Appellant testified that he put the key in the ignition and felt a warmth go through him, which he knew to be the negative presence. He then lifted his arm rest and found a pack of red Winston cigarettes and red lighter that were not his. Appellant stated that right away he knew that the negative energy, or Satan, was trying to test him, and he knew he was going to pass the test.

Appellant drove down the road a little way and came across a person he knew. Appellant asked the person if he smoked, and the person said "no." So, appellant threw the cigarettes in the gutter, and he knew that he and the other person were both on the good side. Appellant kept driving, and encountered another friend, with whom he always used to do drugs. The friend was carrying a red gas can. Even though appellant's car was out of gas, appellant knew that if he took the gas from his friend he would go do drugs. So, appellant took off. Appellant then drove to a friend's house with whom he used to go to church. Appellant wanted to tell his friend that he realized now that God is real. However, appellant's friend was not home.

Appellant then left the house. He testified that as he was driving away, he felt something come over him, and he no longer had any control of his hands or his body. Appellant stated that he was just sitting there, but the car was driving itself perfectly. Appellant then closed his eyes. When he opened his eyes, the car was still driving perfectly on the road. Appellant closed his eyes again, and kept them closed for longer than 10 seconds. When appellant opened his eyes the second time, he was on a different road. Appellant testified that he saw traffic up ahead, which he believed was trying to block him from getting to his destination, so whatever

7

presence was driving the car shot through the corner gas station. Appellant then came across four barrels blocking the street, and there was a person standing next to the barrels. Appellant asked the person if he could go around, and the person said "alright, go ahead." Appellant testified that all of this occurred on State Route 23 and State Route 6, not in the village of Bradner.

Appellant next testified that after he passed the barrels, he looked around and everything was beautiful, and there was nothing but nature and birds. Appellant stated that he closed his eyes and grabbed onto the steering wheel, and something came over him that put his foot down on the gas. All of a sudden, appellant heard the car hitting something, but he thought it was Satan trying to get him to open his eyes, so appellant kept his eyes shut, because if he opened his eyes then he would have lost his faith in God being with him. When appellant finally opened his eyes, the car's windshield was shattered, and the airbag had been deployed, but appellant was completely fine.

Appellant climbed out of the car. He testified that at that point he was so happy because he knew that God was real, he had passed the test, and God protected him. As he was walking around, appellant realized that he might have screwed up a construction site, but he had no idea that he had hit anybody. Appellant then felt people putting their hands on him trying to get him to sit down. Appellant thought that the people were going to try to harm him so he took off running. Suddenly, appellant felt his body go numb and he collapsed to the ground because somebody struck him on the back of the head. Appellant then threw rocks at the people following him, and took off running again. Appellant testified that as he was running he ran right into a police officer.

Appellant concluded by testifying that he did not intend to harm anyone in any way, and he was not even aware at the time that he had hit someone.

Following the presentation of evidence, jury instructions, and closing arguments, the jury retired to deliberate. Approximately three hours later, the jury returned with a verdict of guilty as to all counts. The trial court proceeded immediately to sentencing. Again the trial court found that the two counts of vehicular assault merged with the two counts of felonious assault, and the state elected to proceed on the counts of felonious assault. In addition, the trial court found that the two counts of aggravated vehicular homicide merged with the count of murder, and the state elected to proceed on the count of murder. As before, the trial court ordered appellant to serve the maximum prison terms on each count, and further ordered them to be served consecutively for a total prison term of 29 years to life.

*State v. Rickard*, 2019-Ohio-298, ¶¶ 2-28

### III. Relevant Procedural History

8

Following his sentencing, Rickard filed a direct appeal with the Sixth District Court of Appeals with the assistance of counsel (ECF No. 12-1, PageID #: 99). In his appeal, Rickard raised three assignments of error:

FIRST ASSIGNMENT OF ERROR

APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I. §10 OF THE CONSTITUTION OF THE STATE OF OHIO.

SECOND ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN DENYING APPELLANT'S RULE 29 MOTION FOR ACQUITTAL AT THE COMPLETION OF THE STATE'S CASE IN CHIEF.

THIRD ASSIGNMENT OF ERROR

THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE INTRODUCED BY THE STATE AT TRIAL.

(*Id*. at PageID #: 100). The appellate court found no error and affirmed Rickard's convictions and sentence on February 1, 2019. (*Id.* at PageID #: 187). Rickard, *pro se*, filed an application for reconsideration with the appellate court on February 15, 2019. (*Id.* at PageID #: 189). That application was denied on March 19, 2019. (*Id.* at PageID #: 224). Rickard did not appeal to the Ohio Supreme Court from that decision. However, on July 10, 2018, while his direct appeal was still pending, Rickard filed a post-conviction motion to vacate. (*Id.* at PageID #: 231). Rickard argued in that petition that his counsel was ineffective for failing to retain an accident reconstruction expert. (*Id.* at PageID #: 232). Although the trial court initially denied the motion as untimely, following a remand (*id.* at PageID #: 527), the Court reviewed Rickard's arguments (*id.* at PageID #: 544-55). Ultimately, the trial court denied Rickard's motion finding that his

9

arguments were barred by *res judicata*. (*Id.* at PageID #: 546-55). Rickard appealed, and the appellate court affirmed the denial of his motion on September 30, 2021. (*Id.* at PageID #: 683). Rickard appealed to the Ohio Supreme Court raising three propositions of law:

> PROPOSITION OF LAW NO. 1:
>
> The Court of Appeals and trial court erred in denying Mr. Rickard's post-conviction motion without a hearing.
>
> PROPOSITION OF LAW NO. 2:
>
> The Court of Appeals and trial court erred in denying Mr. Rickard's post-conviction motion and concluding that his post-conviction motion was barred by the doctrine of res judicata where the evidence had not been available at the time of the direct appeal because of the trial attorney's ineffectiveness.
>
> PROPOSITION OF LAW NO. 3:
>
> The concurring opinion of one judge of the court of appeals misunderstood that Mr. Rickard was challenging the veracity of the witnesses as to the underlying offense, not merely the specifications.

(*Id.* at PageID #: 716). On January 18, 2022, the Ohio Supreme Court declined to hear the appeal. (*Id.* at PageID #: 789).

### IV. Federal Habeas Corpus Petition

On July 14, 2022, Rickard petitioned through counsel that this Court issue a writ of habeas corpus. (ECF No. 1). Rickard's petition does not clearly delineate a ground for relief. However, within his 48 numbered paragraphs, Rickard's closest assertion that could be construed as a ground for relief is as follows:

> Here Mr. Rickard's rights under the Constitution and laws of the United States were violated in that the denial of his post-conviction petition denied him his right to due process under the Fourteenth Amendment to the United States Constitution.

(ECF No. 1 at 10). Respondent filed the return of the writ on October 4, 2022 (ECF No. 12), and

10

Rickard filed his traverse on November 2, 2022 (ECF. No. 13).

### V. Law and Argument

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in application of state law ... are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").

Respondent argues that Rickard's sole ground for relief should be dismissed because it is dependent upon a finding of error in post-conviction proceedings – an argument that is not cognizable under Sixth Circuit case law. (ECF No. 12 at 16-17 (citing *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986))). Rickard's traverse addresses his argument that the State appellate court erred in denying his post-conviction petition and does not address whether he has raised a cognizable claim for habeas review. (*See* ECF No. 13). Because Rickard's sole ground for relief attacks the decision in post-conviction proceedings, this Court agrees with Respondent that Rickard has failed to raise a cognizable ground for habeas review.

Rickard's sole ground attacks the state court's handling of his post-conviction relief—a collateral matter—rather than the underlying state conviction giving rise to his conviction. "It is clear, not only from the language of ... § 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that

11

custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). States have no federal constitutional obligation to provide post-conviction remedies (*see e.g., Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)), and the Sixth Circuit has thus held that "habeas corpus cannot be used to challenge errors or deficiencies in state postconviction proceedings." *Davis v. Burt*, 100 F. App'x 340, 351 (6th Cir. 2004); *see also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (stating that "the writ is not the proper means" to challenge "collateral matters," which differ from "the underlying state conviction giving rise to the prisoner's incarceration") (internal citations omitted). The Sixth Circuit recently reaffirmed this holding:

> [H]abeas corpus [petitions] cannot be used to mount challenges to a state's scheme of post-conviction relief ... [The petitioner] has not pointed to any decision by an *en banc* court or any Supreme Court decision to undermine the logic of *Kirby* that attacks on post-conviction proceedings 'address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration.'

*Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854-55 (6th Cir. 2017) (internal citations omitted); *see also Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998) (stating that a claim of constitutional error that "focuses only on the State's post-conviction remedy and not the judgment which provides the basis for [the applicant's] incarceration ... states no cognizable federal habeas claim").

Rickard's sole argument focuses upon the state court's resolution of his post-conviction motion to vacate. Accordingly, he has not set forth a cognizable claim for this Court to consider.

**VII. Recommendation**

Because Rickard's sole ground for relief is not cognizable, I recommend that the Court DISMISS his petition and not grant him a certificate of appealability.

DATED: April 1, 2024

                                                          s/ Carmen E Henderson
                                                          Carmen E. Henderson
                                                          United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).